UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| FEDERAL TRADE COMMISSION | CIVIL ACTION |
| VERSUS | NO:  89-1740 |
| NATIONAL BUSINESS<br>CONSULTANTS, INC., et al | SECTION: "M"(1) |

## REPORT AND RECOMMENDATION

Before the undersigned is the motion by Claude C. Lightfoot, Jr. ("Receiver") for approval of the application of Emile L. Turner, Jr. of the Law Office of Emile L. Turner, Jr. ("Mr. Turner") for professional fees of $289,503.25 and expenses of $13,298.17 for a total $302,802.17.  Mr. Lightfoot is proceeding in his capacity as receiver of Namer, Inc., Voice of America, Inc. ("VOA") and America First Communications, Inc. ("AFC").  Rec. doc. 1296. All motions for fees and costs in this case were referred to the undersigned.  Rec. doc. 1263.

For the reasons described below, it is recommended that Mr. Turner be awarded fees of $231,600.00 and expenses of $10,400.00 for a total of $242,000.00.

## BACKGROUND

The Federal Trade Commission ("FTC") filed its complaint on April 19, 1989, against National Business Consultants, Inc. ("NBC") and Robert Namer ("Namer") in CA No. 89-1740.

At the time, Namer and NBC were engaged in the nation-wide sale of business franchises.  The FTC alleged that Namer and NBC made numerous material misrepresentations to potential franchisees, made unsupported earnings claims, failed to provide required supporting documentation, and failed to make required disclosures.  The FTC sought injunctive and monetary relief to redress the losses suffered by defrauded franchisees.  Following a bench trial on the issue of liability, the district court found in favor of the FTC.  In November 1991, the district court entered a judgment rendering Namer and NBC jointly and severally liable to the FTC

for three million dollars, which represented the relief and damages awarded for consumer redress.

FTC v. National Business Consultants, Inc., 376 F.3d 317, 318-19 (5th Cir. 2004), cert. den., 544 U.S. 904, 125 S.Ct. 1590 (2005).  Although some amounts were collected on the judgment, it has not been satisfied.[1]

On July 12, 2002, the FTC moved to be permitted to examine Namer, pursuant to the Federal Debt Collection Procedure Act ("FDCPA"), 28 U.S.C.A. §§ 3001-3308.  Rec. doc. 796.  The examination was conducted on August 28, 2002.  Rec. doc. 856.  Namer proceeded in proper person.  During the examination he was asked if he had access to a safe deposit box.  He invoked his privilege under the Fifth Amendment and refused to answer the question.  Id. at 127.  The District Judge continued the hearing to permit Namer to secure counsel.  Id. at 131.  On January 8, 2003, the examination resumed, rec. doc. 857, at which time Namer was represented by counsel.  Id. at 2.  Namer urged that the FTC had no right to proceed with the judgment debtor examination.  Id. at 5.  The District Judge found that the FTC had the right to question him on the safe deposit box.  Id. at 5-6.  Oral motions for an immediate appeal and to close the proceeding were denied.  Id. at 6-7.  Namer submitted a motion to recuse the District Judge which was taken under submission.[2]  Id. at 9.

On January 27, 2003, the District Judge issued findings of fact, conclusions of law and an

---

[1] In an unpublished *per curiam* decision, dated October 12, 2007, on several appeals by Namer, the Fifth Circuit said: "[b]y May 2005, over thirteen years after the entry of the judgment, Namer and the Corporation had paid only $140,149.79 toward the judgment."  Rec. doc. 1277 at 3.

[2] There was no examination of Namer on January 8, 2003.  The only examination occurred on August 28, 2002.

order to show cause.[3]  The District Judge concluded that Namer made use of Namer, Inc., AFC and VOA for the calculated purpose of frustrating the FTC from enforcing the judgment in its favor and had violated the FDCPA.  Namer, Inc., AFC and VOA were ordered to show cause on March 11, 2003, why they should not be cast as judgment debtors.  Rec. doc. 832.  On April 8, 2003, the judgment was amended to add them as judgment debtors.  Rec. doc. 851 in 89-1740.  The Fifth Circuit affirmed and determined that the record supported the finding that Namer engaged in the transfer of income and assets calculated to hinder, delay, and avoid collection of the judgment against him in violation of the FDCPA.  376 F.3d at 319-322.  The Supreme Court denied writs on March 7, 2005.  125 S.Ct. at 1590.

The FTC took measures to execute on the judgment:  (1) on December 10, 2004, it applied for a writ of continuing garnishment naming Copytek-Tronics, Inc. as garnishee (Rec. doc. 860); (2) on May 31, 2005, it applied for writs of execution on Namer, Inc., AFC and VOA (Rec. docs. 896-902); (3) on June 2, 2005, it sought to inventory the contents of a safe deposit box (Rec. doc. 885); and (4) on June 17, 2005, it secured the appointment of the Receiver and Mr. Turner (Rec. docs. 892 and 908).  Mr. Turner was to act as general counsel to assist the Receiver in all aspects of his appointment.  He was to be compensated at the rate of $295 per hour.  The order states:

> All approved or to be approved compensation and expenses shall be exclusively limited to and paid from the proceeds in the care, custody, and control of the Receiver derived from the assets of Namer, Inc., America First Communications, Inc. and Voice of America, Inc., all as per Order appointing Receiver.  Thus, the United States is exempted and protected forever from any claim in any amount that exceeds the amount of the proceeds available in the hands of the Receiver for any costs, fees, out of pocket expenses, compensation, or any other claim whatsoever.

Rec. doc. 892 at 1-2.

---

[3]  The motion to recuse was denied.

3

## RESULTS OF THE RECEIVERSHIP

Mr. Turner reports that the assets of the various entities under the Receiver's administration were recovered and liquidated as follows:

| | | |
|---|---|---|
| a. | CopyTek-Tronics stock | $  25,000.00 |
| b. | 3313 Kingman Street, Metairie | $330,000.00 |
| c. | Movables at Kingman Street | $    2,600.00 |
| d. | WASO radio station and immovable property, Covington | $578,100.00 |
| | Total | $935,700.00 |

The Receiver was authorized to reimburse the U.S. Marshals Service $16,459.77 for expenses incurred in connection with the seizure of the property of the judgment debtors.  Rec. doc. 1293. The Receiver was granted authority to pay a brokerage fee of $33,900.00 to William Whitley of Media Services Group in connection the sale of the radio station.  Special counsel for the Receiver in connection with the sale of the radio station, Joseph C. Chautin, III, was awarded fees of $50,000.00 and costs of $1,778.82 for a total of $51,778.22.  Rec. doc. 1280.  The total of these fees and costs amount to $102,137.99.  After their payment, the Receiver will have about $833,000.00 in net collections.

## COVINGTON PROPERTY

On February 8, 2005, Namer contacted an attorney, Andrew Joffe, about handling an act of sale of the Kingman Street property and 11.36 acres with a radio station transmitting tower and other improvements in St. Tammany Parish.  An abstract of the Kingman Street property reflected a money judgment in favor of the FTC, but the judgment was not recorded in St. Tammany Parish. On February 15, 2005, there was a closing at which AFC assigned 11.65 acres and improvements

to Miss Lou Properties, LLC.[4]

On June 20, 2005, the Kingman Street property was seized.  Rec. docs. 912-17 and 1306 at 2.  On June 21, 2005, the Receiver learned that, notwithstanding the seizure of the Kingman Street property with its radio station equipment, WASO was still broadcasting and thereby discovered the 11.65 acres in St. Tammany Parish with a broadcasting substation and 250 foot radio tower.  Rec. doc. 1306 at 2-3.  On about June 23, 2005, the FTC recorded the judgment in St. Tammany Parish at which time, the Receiver learned of the mortgage in favor of Miss Lou Properties. Id.

On August 12, 2005, the Receiver filed a complaint against Miss Lou Properties and the Recorder of Mortgages and Registrar of Conveyances for St. Tammany Parish (The "Miss Lou Properties litigation").[5]  The Receiver contended that AFC, acting through Namer, and Miss Lou Properties violated the FDCPA by transferring real property from AFC to Miss Lou Properties as a result of which the act of sale and related documents were null.  On September 1, 2006, it was recommended that the Receiver's motion for summary judgment be granted.[6]  An order and judgment were entered in conformity with the recommendation.[7]

## FTC'S FAILURE TO RECORD JUDGMENT

The issue of the failure of the FTC to record the judgment in St. Tammany Parish was raised by the undersigned.  The report and recommendation stated that, "[t]his prompts the question of whether the FTC was negligent in failing to do so."  CA 05-3776-Rec. doc. 48 at 4.  The Receiver

---

[4]  CA 05-3776, Rec. doc. 38 (Exhibit F).

[5]  CA 05-3776, Rec. doc. 1.

[6]  CA 05-3776, Rec. doc. 48.

[7]  CA 05-3776, Rec. docs. 51 and 52.

and his counsel were put on notice that if they sought authorization to recover fees and expenses for the suit against Miss Lou Properties and others, they or the FTC were required to explain why the FTC did not record the judgment in St. Tammany Parish.  Id. at 5, n. 2.

The Receiver's application for fees and expenses for Mr. Turner includes time and expenses incurred in the Miss Lou Properties litigation.  The Receiver or the FTC were ordered to file a memorandum with an explanation of why the FTC did not record the judgment in St. Tammany Parish.  Rec. doc. 1305.  A supplemental memorandum was filed.  Rec. doc. 1306.

Mr. Turner and the Receiver contend that the FTC was unaware of the property in St. Tammany Parish.  The transcript of the August 28, 2002 judgment debtor examination confirms that Namer did not disclose the existence of the St. Tammany Parish property.  The only real property referred in the examination was the Kingman Street property and other properties in Jefferson Parish in which Namer or his family had an interest.

The Fifth Circuit reviewed the record on the judgment debtor examination and said:

> The evidence in the record adequately supports the district court's finding.  There was evidence that assets were transferred directly or indirectly to Voice of America, Inc., America First Communications, Inc., and Namer, Inc. in lieu of payments to Namer for his services.  Not only is it apparent from the record that these transfers were made to the various corporate entities on Namer's behalf, it is also readily apparent that this was done in an effort to frustrate the satisfaction of the judgment at issue.  There was also sufficient evidence in the record to show that Namer made loans and contributions to Friends of Robert Namer in an effort to avoid collection of the judgment against him.  Namer has pointed to nothing in the record that causes us to question the district court's findings, let alone find them clearly erroneous.

376 F.3d at 321-22.  The Fifth Circuit referred to Namer's testimony at the judgment debtor examination as "cryptic."  Id. at 322, n. 8.

The District Judge presided over the entirety of the examination.  About two-thirds of the way through the proceeding, the Court commented that Namer was directed to answer questions but

he had not done so.  Namer protested and urged that his statement that he could not recall to whom he had provided political consulting services over the preceding twelve months was a proper answer. The Court responded:

> You haven't given a single answer to the question this lady (Jan Charter - counsel for the FTC) has put to you as to the specific question she asks.  It's as clear as it can be on the record.

Rec. doc. 856 at 75.  Namer testified that he broadcast on WASO radio.  Until his campaign for public office he had been the general manager of the station.  Id. at 39.  The verbal agreement for him to function as general manager was between VOA and the station.  Namer's wife was the sole proprietor of VOA, while he described himself as a consultant for VOA.  He referred to his relationship with VOA as a "working understanding" which was not represented by a written or oral agreement.  Id. at 40.  When pressed by the Court, he acknowledged that VOA was a corporation with its office on Kingman Street.  His wife was the sole stockholder and he was the president.  Id. at 41.  Namer testified that WASO was owned by a series of stockholders whom he was not able to identify.  Id. at 43.  On further questioning, he acknowledged that Namer, Inc. owned 40% of WASO and that Namer, Inc. was owned by his children.  Id. at 46.  Finally, Namer testified that the AFC owned WASO and possessed the license from the FCC to operate the station.  Id. at 47. Namer testified that he did not bring information to the examination on WASO/AFC.  Id. at 54. After many pages of testimony on the radio operation in which Namer did not disclose the existence of the property in St. Tammany Parish, the Court commented on his failure to answer questions and indicated that no purpose would be served with further questioning.  Id. at 62-63.

The failure of the FTC to record the judgment in St. Tammany was the result of Namer's refusal to testify candidly about his affairs at the judgment debtor examination.  The Receiver has

collected nearly a $1 million.  If Namer had not acted to frustrate the FTC's debt collection efforts at every turn, perhaps an agreement could have been reached to bring this to a conclusion.  Instead, most of the proceeds will be consumed in fees and expenses and the judgment will remain outstanding.  Namer has no one to blame but himself for this outcome.

It would be unjust to deny the Receiver or his counsel recovery of their reasonable fees and expenses for the pursuit of the Miss Lou Properties litigation.  Pursuant to the order appointing Mr. Turner as counsel for Receiver, all approved compensation and expenses shall be exclusively limited to and paid from the funds in the control of the Receiver derived from the assets of Namer, Inc., AFC and VOA.  Rec. doc. 892.  If the Receiver and his counsel were not allowed recovery of their fees and expenses for the successful prosecution of the Miss Lou Properties litigation from the assets liquidated by the Receiver, they would receive no compensation for these services.

<u>BILLING JUDGMENT</u>

The method by which the district court calculates an attorneys' fees award is well established. The district court first calculates the "lodestar."  <u>Forbush v. J.C. Penney Co.</u>, 98 F.3d 817, 821 (5th Cir. 1996).  The lodestar is the product of the number of hours reasonably expended on the litigation multiplied by a reasonable hourly billing rate.  <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 103 S. Ct. 1933, 1939 (1983).  Counsel is "then required to exercise billing judgment to exclude from the fee request any "hours that are excessive, redundant or otherwise unnecessary."  <u>Hensley</u>, 103 S. Ct. at 1939-40.

Billing judgment refers to the usual practice of law firms in writing off unproductive, excessive, or redundant hours.  <u>Walker v. U.S. Dep't of Hous. and Urban Dev.</u>, 99 F.3d 761, 769-70 (5th Cir. 1996).  Plaintiffs submitting fee requests are required to exercise billing judgment.  <u>Id</u>.

There is no basis to make a distinction between an attorney for a court-appointed Receiver and an attorney for a prevailing party who is entitled to recover attorneys' fees. "Ideally, billing judgment is reflected in the fee application, showing not only hours claimed, but also hours written off." Alberti v. Klevenhagen, 896 F.2d 927, 930 (5th Cir. 1990). Counsel are charged with the burden of showing the reasonableness of the hours they bill and, accordingly, are charged with proving that they exercised billing judgment. Walker, 99 F.3d at 770. With one exception, the statement submitted Mr. Turner does not present any evidence of the exercise of billing judgment. The entry for March 10, 2006, reflects three hours for a return trip from Jackson, Mississippi. The time is charged at one-half of the normal rate.[8] Rec. doc. 1296 (Exhibit A at 44). "The proper remedy when there is no evidence of billing judgment is to reduce the hours awarded by a percentage intended to substitute for the exercise of billing judgment."[9] Walker, 99 F.3d at 770.

A careful examination of Mr. Turner's statement reveals some entries that should have been written off in the exercise of billing judgment.

Some of the work performed by Mr. Turner was not necessary. Namer's conduct was vexatious and he sought to frustrate the FTC and then the Receiver at every step. This trait was well-known before Mr. Turner accepted the appointment as the Receiver's general counsel. Indeed, the appointment of the Receiver was prompted by the addition of Namer, Inc., AFC and VOA as

---

[8]  The billing records reflect three trips to Jackson: December 21, 2005, for the deposition of Ben Walker; March 8-10, 2006, for the deposition of Mack Robinson; and July 11, 2006, for the depositions of Reaves and Coker. The billing records reflect that the only adjustment for travel time was the return trip on March 10, 1006. A similar reduction was in order for each trip.

[9]  Percentage reductions of twelve and a half percent to twenty-five percent have been used or cited with approval by the Fifth Circuit. See Leroy v. City of Houston, 831 F.2d 576, 585-86 (5th Cir.1987), cert. denied, 486 U.S. 1008, 108 S.Ct. 1735 (1988) (thirteen percent); Walker, 99 F.3d at 770 (fifteen percent); Hopwood v. State of Texas, 236 F.3d 256, 279 (5th Cir. 2000) (twenty-five percent); and Cambridge Toxicology Group, Inc. v. Exnicios, 495 F.3d 169, 181 -182 (5th Cir. 2007) (twelve and a half percent).

judgment debtors.  Mr. Turner allowed himself to be drawn into the disputes with Namer when the same result could have been achieved with less effort.

On November 6 and 7, 2007, and in response to a letter from Namer, Mr. Turner prepared a motion for civil contempt.  Rec. doc. 1296 (Exhibit A).  The motion was filed on November 8, 2007.  Rec. doc. 1266.  The motion was denied without reasons.  Rec. doc. 1281.

On April 17, 2006, the Receiver filed an opposition to objections filed by Namer.  Rec. doc. 1129.  In the summer of 1995, Namer began filing a series of motions.  Just prior to Hurricane Katrina the motions were denied.  Rec. docs. 997-99, 1006, 1009, 1012 and 1029.  Namer filed motions for reconsideration, which were denied in a two page order without any discussion of the arguments raised by Namer.  Rec. doc. 1092.  Namer filed objections to the orders as well as the order denying his motions for reconsideration.  Rec. docs. 1106-11.  The Receiver filed a response to these objections.  While Mr. Turner spent nearly 3.5 hours on research on Fed. R. Civ. P. 11, the only authority cited is the rule itself. Rec. doc. 1296 (Exhibit A).  Additional work was done by Mr. Turner and his staff on the response to the objections on April 3, 4, 5 and 10, 2006.  Id.  Much of this was unnecessary.

On June 27, 2005, Mr. Turner spent 4.7 hours on the Receiver's opposition to remove Receiver.  On July 5, 2005, Mr. Turner spent 3.5 hours on a response to Namer's motion to vacate.  A July 6, 2005 entry includes time for a response to a letter from Namer to the undersigned.  No order was issued requiring the Receiver to respond to the letter.  On July 19, 2005, Mr. Turner recorded 6.0 hours for the preparation of rebuttal memoranda on several of Namer's motions.  A

similar entry appears at August 9, 2005.[10]

Some of the work performed by Mr. Turner was not directly related to the activities of the Receiver and, in the exercise of billing judgment, it should have been written off. Some examples of this type of activity are: July 13, 2005 (0.10 hours-receipt and review of motion for return of 2004 Lincoln); July 26, 2005 (0.10 hours-receipt and review of Namer's response to Ford's objection to seizure and the FTC's response); and August 28, 2006 (0.10 hours-receipt and review of executed order granting the FTC's extension regarding release of items in safety deposit box). Even though the time recorded was minimal, it all related to the activities of the FTC. The Receiver had no responsibilities for Namer's personal automobile or his safe deposit box.

Mr. Turner was appointed as general counsel for the Receiver. This did not extend to routine non-legal matters for the Receivership. Such matters should have been the responsibility of the Receiver. Even if it was sometimes necessary for Mr. Turner to perform a non-legal function for the Receiver, it should not have been charged at the rate for his work as general counsel. In the exercise of billing judgment, such entries should have been written off or marked down. Some examples are: July 15, 2005 (0.30 hours - includes time spent talking to Keith Barrio, a grass cutter); July 20, 2005 (1.50 hours - includes calls to air conditioner repairman and grass cutter); and November 10, 2005 (1.00 hour - includes time spent talking to contractor about repairs and other

---

[10] Other examples may be found at the entries for: December 8, 2005 (3.10 hours-Namer's motion for rehearing of seven orders); December 13, 2005 (3.00 hours-opposition to motion for reconsideration); December 14, 2005 (0.60 hours-receipt and review of letter from Namer to Magistrate re Rule 60 motion to dismiss and prepare a reply); December 27, 2005 (0.90-receipt and review of two motions for reconsideration and preparation of objection to motions); February 23, 2006 (0.80-hours receipt and review of opposition to auction by Namer and dictated response); February 24, 2006 (0.60 hours-reviewed and edited reply to opposition (Rec. doc. 1085 filed on March 1, 2005)); May 2, 2006 (2.70 hours-reviewed and revised draft of opposition to motion to stay); May 4, 2006 (2.50 hours-opposition to objection to order denying enrollment of counsel); June 7, 2006 (0.40 hours-opposition to Namer's motion for contempt); June 9, 2006 (1.00 hour-response to motion for contempt); and June 14, 2006 (0.80 hours-research on rights of pro se litigants). Rec. doc. 1296 (Exhibit A). These entries are illustrative. They are not a complete list of entries where Mr. Turner's time entries appear excessive.

work at Kingman Street).[11]

The undersigned's review of the record demonstrates that twenty percent is the appropriate reduction for the failure to exercise billing judgment. The amount sought by Mr. Turner will be reduced by $57,903.25. After this exercise of billing judgment the lodestar is $231,600.00 ($289,503.25 - minus $57,903.25)

## HOURS REASONABLY EXPENDED

In calculating the lodestar, the hours worked should be supported by the billing records of the attorney making the claim for fees. Watkins v. Fordice, 7 F.3d 453, 457 (1993). The court then determines the number of hours that were "reasonably expended" in litigation of the claim. The Fifth Circuit instructs that compensable hours are determined from the attorney's time records and include all hours reasonably spent. Shipes v. Trinity Industries, 987 F.2d 311, 319 (5th Cir. 1993).

The undersigned carefully reviewed Mr. Turner's statement. It contains detailed descriptions for each entry. After the reduction for billing judgment, the remaining hours were reasonably expended by Mr. Turner as general counsel for the Receiver.

## HOURLY RATE

The lodestar is the product of the number of hours reasonably expended on the litigation multiplied by a reasonable hourly billing rate. Hensley, 103 S. Ct. at 1939-40. At this step in determining the lodestar, district courts must select an appropriate hourly rate based upon the

---

[11] Similar entries may be found at: November 16, 2005 (0.70 hours-receipt of bill from electrician, spoke to contractor, and call to vendor); November 17, 2005 (0.20 hours - receipt of invoice from glass company and letter requesting invoice be reissued); November 22, 2005 (0.30 hours - includes time for contact with Gendusa Glass) December 14, 2005 (0.30 hours - includes second request to Gendusa Glass for re-issuance of invoice to proper party); January 9, 2006 (0.40 hours-spoke at length with contractor regarding inspection of the hurricane damage); January 19, 2006 (0.40 hours-includes time for review of electric bill for tower in Covington); and August 19, 2006 (0.20 hours receipt of Cleco bill and send to Receiver). Again, these entries are illustrative.

prevailing community standards for attorneys of similar experience in similar cases.  Shipes v.

Trinity, 987 F.2d at 319 (emphasis added).  The statement demonstrates that the hourly rate for Mr.

Mr. Turner is consistent with the Court's order.  Rec. doc. 890.  Where the work was assigned to

persons with less experience, lower hourly rates were employed.  These lower hourly rates are

consistent with the prevailing community standards for attorneys with similar experience.

## JOHNSON FACTORS

"The district court may then adjust the lodestar upward or downward depending on the

respective weights of the twelve factors set forth in Johnson v. Georgia Highway Express, Inc., 488

F.2d 714, 717-19 (5th Cir. 1974)."  Forbush, 98 F.3d at 821; see also Walker, 99 F.3d at 771-73 (5th

Cir.1996) (describing the limited circumstances in which an adjustment to the lodestar is

appropriate).  The Johnson factors are as follows:  (1) the time and labor required; (2) the novelty

and difficulty of the question; (3) the skill required to perform the legal service properly; (4) the

preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee;

(6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the

circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and

ability of the attorneys; (10) the "undesirability" of the case, (11) the nature and length of the

professional relationship with the client, and (12) awards in similar cases. Johnson, 488 F.2d at 717-

19.  While the court is required to give reasons upon which an award is based, it is not required to

fully address each of the Johnson factors in the recitation of its reasons.  See Curtis v. Bill Hanna

Ford, Inc., 822 F.2d 549, 552 (5th Cir. 1987).  In Hensley the Supreme Court noted that many of the

Johnson factors are "subsumed" in the initial calculation of reasonable hours and rates. 103 S. Ct.

at 1940 n. 9.

The Receiver urges that an enhancement should be applied because of the delay in payment. The Receiver notes that the March 21, 2005 order of appointment for Mr. Turner provided for payment upon monthly applications.  Rec. doc. 892.  The Receiver cites Walker in which the Fifth Circuit said:

> The district court awarded a 6% enhancement to compensate for the delay in payment. In compensating for a delay, the district court may either grant an unenhanced lodestar based on current rates, or calculate the lodestar using the rates applicable when the work was done and grant a delay enhancement.  It may not do both.

99 F.3d at 773 (citations omitted).  The lodestar employs the rate of $295.00 per hour for Mr. Turner.  He demonstrates that this hourly rate was approved in Bankruptcy Court for the Eastern District of Louisiana.  Rec. doc. 1296 (Exhibit B).  Some of these cases were filed in 2007 and thus Mr. Turner's rate of $295 is within the range of current hourly rates.[12]  Since the lodestar is based on current rates, it may not be enhanced for the delay in payment.

## COSTS

Mr. Turner seeks to recover $13,298.92 in costs.  The itemized costs include charges for expert consultation, process servers, an abstract on Kingman Street, transcripts of depositions, travel expenses on three trips to Jackson, court filings, newspaper advertisements, and document copying vendors.  These costs were reasonably incurred.  The undersigned's review of the statement indicates that these costs were about $7,500.00

The itemized costs also include charges for long distance telephone, photocopies made by

---

[12] In Downey v. Strain, 2006 WL 1581234, *5 (E.D. La. 2006), the undersigned approved rates of $225 per hour for lead counsel for plaintiff in a claim for relief under the Family Medical Leave Act, 29 U.S.C. § 611.  In Greater New Orleans Fair Housing Action Center, et al v. St. Bernard Parish, et al, 06-7185-HGB (Rec. doc. 120 at 5-6), rates of $350 per hour were approved for lead counsel in an action alleging violations of the Fair Housing Act of 1968, 42 U.S.C. § 3601.

Mr. Turner's firm, transmittal of documents by facsimile, and postage.  It is estimated that these costs come to about $5,800.00 of which $1,750.00 is attributable to facsimile charges.  These types of charges are sometimes absorbed into an attorney's overhead.  For example, the itemization of costs by Joseph Chautin includes only three charges for copies for a total of about $25.00, but no charges for facsimile transmittals or postage.  Rec. doc. 1264 (Exhibit A).  These other costs accounted for more than forty percent of Mr. Turner's expenses.[13]  In the absence of an exercise of billing judgment for these charges, the expenses for long distance telephone, photocopies, transmittal of documents by facsimile and postage will be reduced by fifty percent or $2,900.00.

It will be recommended that Mr. Turner be reimbursed for $10,300.00 ($13,298.92 minus $2,900.00 equals $10,298.92, rounded to $10,300.00).

## RECOMMENDATION

It is RECOMMENDED that:

1.    The Receiver's motion to approve and pay first application of general counsel for fees and expenses (Rec. doc. 1306) be GRANTED in PART and DENIED in PART.

3.    Emile L. Turner, Jr. and the Law Office of Emile L. Turner, Jr. be awarded fees of $231,600.00 and costs of $10,300.00 for a total of $241,900.00.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal

---

[13]  In Greater New Orleans Fair Housing Action Center, et al v. St. Bernard Parish, et al, CA 06-7185-HGB (Rec. doc. 108 at 38-39) the prevailing plaintiffs, in the exercise of billing judgment, excluded all charges for copying, faxing, telephone and court costs.

the unobjected-to proposed factual findings and legal conclusions accepted by the district court,

provided that the party has been served with notice that such consequences will result from a failure

to object.  <u>Douglass v. USAA</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 7th day of July, 2008.

**SALLY SHUSHAN**
**United States Magistrate Judge**

16